Advance Pressure Castings, Inc. v. Commissioner.
Advance Pressure Castings, Inc. v. Commissioner
Docket No. 12484.
United States Tax Court
1948 Tax Ct. Memo LEXIS 235; 7 T.C.M. (CCH) 140; T.C.M. (RIA) 48038; March 12, 1948
*235 In 1943 the taxpayer corporation, on the accrual basis, discontinued use of steel dies in the manufacture of civilian products. In that year estimates were made of the cost of examining and making necessary repairs to the dies at the termination of the war in order to resume civilian production. Repairs were later made and paid for in 1945, 1946, and 1947. Held, these business expenses were not incurred in 1943 and deduction of the estimated repair cost is denied. Milton J. Levitt, Esq., for the petitioner. Thomas R. Charshee, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The tax in controversy is excess profits tax for the calendar year 1943, arising out of a deficiency of $18,412.88, and a claimed overpayment of $6,152.77. Several adjustments to net income and average invested capital are not in issue. The sole matter in dispute is whether the Commissioner erred in disallowing a deduction in the taxable year of the estimated cost of future repairs to steel dies used in the manufacture of metal castings. Findings of Fact Petitioner is a New York corporation with its principal office in Brooklyn, New York. Reporting its income *236 on an accrual basis of accounting, it filed its corporation income and declared value excess-profits tax return and corporation excess-profits tax return for the year ended December 31, 1943, with the collector of internal revenue for the first district of New York. Since 1932 petitioner has manufactured die castings of non-ferrous metals, pursuant to specifications submitted by its customers. Petitioner supplies these solidified metal castings, moulded in desired shapes and later to be processed into finished hardware and machine parts, to buyers in the automotive, electrical, and plumbing trades. In the normal course of business, orders are received which request the manufacture and delivery of certain castings in conformance with enclosed blue prints. Metal dies, usually of hard steel and subject to close tolerances, are then designed by petitioner after which they are made by skilled die-makers. Although all dies, tools, and fixtures required for the production of castings are the property of petitioner, a portion of their cost is assumed by the customer. After a sample casting has been approved by the customer, the required run of castings is completed and the order is filled. *237 The die is then removed from the casting machine and is sent to the die shop where it is examined for inaccuracies due to wear and tear, coated with preservative oil or wax, and stored in the die rack until needed. Because of variable marketing trends the degree of obsolescence among the many dies is substantial. Petitioner has met this factor by reserving the right to scrap those dies, tools, and fixtures not used during a three-year period. Through past experience petitioner adopted the practice of periodically reexamining all dies for accumulations of rust and other deterioration arising from extended storage. When a die was not used for four months, inspection and necessary repairs followed, the cost of which was borne according to the following contract terms: "Dies, tools and fixtures for the manufacture of castings of any of the diecastable alloys excepting aluminum will be kept in condition for production by us without expense to you. Dies, tools and fixtures for the manufacture of castings of aluminum alloys will be kept in condition for production by us without expense to you for the first fifty thousand operations after which there will be a charge to you for maintenance *238 and/or replacement." The reconditioning costs which were sustained by petitioner were claimed as deductions from gross income in the year when the repairs were made. In 1943 petitioner had on hand in excess of 1,000 dies which had previously been used in the manufacture of civilian products. Of this number, however, only 583 were "live dies" (dies which were used at least once within the prior three years). Beginning in 1942 the War Production Board gradually restricted the use of aluminum and zinc to material needed for the war effort. In 1943 petitioner was completely prohibited from making further use of dies for the manufacture of civilian products containing aluminum or zinc. In view of these regulations, petitioner coated its live dies with a heavy layer of grease and stored them in a newly rented warehouse for the duration of the war. Realizing that the dies could not be used again before the termination of the war, petitioner's estimating department inspected the stored dies in 1943 and arrived at an estimated cost for the eventual reconditioning thereof. This expense, estimated at $27,723.02 and labeled "Provision for Die Maintenance, Repairs and Replacements," was claimed *239 as a deduction in its 1943 income and declared value excess-profits tax return. In Schedule L of this return, petitioner carried a "Reserve for Die Maintenance, Repairs, and Replacements" of $27,723.02 as a liability in the balance sheet for the end of the taxable year. In 1945, 1946, and 1947 petitioner gradually renewed civilian production and restored the dies to serviceable condition as orders were received. The actual costs of the examination and repair of the stored dies were paid for in those years and were duly charged against the reserve account instead of being claimed as tax deductions in the respective years when payments were made. The Commissioner disallowed the deduction of $27,723.02 taken by petitioner on its 1943 return, stating in the deficiency notice that, "Deductions for estimated future expenses neither paid nor incurred during the taxable year are not authorized by the Internal Revenue Code." Opinion ARUNDELL, Judge: The pertinent statutory provision under which petitioner seeks to qualify is section 23(a) (1) (A) of the Internal Revenue Code. This section authorizes the deduction from gross income of "All the ordinary and necessary *240 expenses paid or incurred during the taxable year in carrying on any trade or business." In opposing the claimed deduction the Commissioner does not question whether the die repairs were ordinary or necesary business expenses or whether the amount estimated as the future cost of these repairs was reasonable. Consequently, the sole issue is whether petitioner "incurred" in the taxable year of 1943 the expense of ultimately examining and reconditioning the steel dies. Petitioner contends that because its income was reported on the accrual basis the anticipated expense of $27,723.02 must be deducted when the liability became fixed. Petitioner urges, moreover, that although the expenses were paid in 1945, 1946, and 1947, the liability for making these repairs "arose not when the work was done, but when in 1943 it became apparent that the work would have to be done." The respondent argues that the liability to meet these costs was not definitely established in 1943 and, therefore, that the expense was not "incurred" in that year because of its contingent nature. We think the facts fully justify the respondent's conclusion. With respect to deductions taken by taxpayers on the accrual *241 basis, we have recently stated in Harrington Company, 6 T.C. 720, the following well-established rule of law: "Expenses are not incurred unless there has arisen an unconditional legal obligation to pay them and they do not accrue within a given taxable year unless all of the events which determine the liability of the taxpayer to pay occur within that year. Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, 519; Bauer Bros. v. Commissioner, 46 Fed. (2d) 874, 875; certiorari denied, 283 U.S. 850." It seems clear to us that the obligation incumbent upon petitioner to examine and repair, when necessary, the civilian dies at the termination of the war was not definitely fixed in 1943. What petitioner is really seeking to deduct is a reserve to cover an estimated cost of work it may be called upon to perform in the future. The dies could not be used during the war, the duration of which was wholly uncertain in 1943. Prior to the advent of war, petitioner's diecasting business was subject to a high degree of obsolescence which was related directly to the consumer demands for the products. Almost half of the dies on hand in 1943 *242 had not been used for a period of three years. Petitioner's secretary-treasurer and sole witness conceded the possibility that all stored dies might be obsolete in two years and testified further that "If it [war] had lasted ten more years, there would not have been any die worth a dime." Even if post-war business conditions warranted the resumption of die-casting for civilian products, petitioner's customers were under no obligation to purchase castings manufactured from the stored dies. In the circumstances, petitioner's liability in 1943 to recondition its dies was clearly contingent and the estimated cost of doing this work, if and when it became necessary, did not constitute an incurred liability in the taxable year. Spencer, White & Prentis v. Commissioner, 144 Fed. (2d) 45; certiorari denied, 323 U.S. 780; Noxon Chemical Products Co. v. Commissioner, 78 Fed. (2d) 871. It follows that respondent's disallowance of the deduction should be sustained. Decision will be entered under Rule 50.